IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
─────────────────────────────
                           :
KEVIN MCHUGH & JENEEN MCHUGH, :      HON. JEROME B. SIMANDLE
                           :
            Plaintiffs,    :      Civil No. 07-2970 (JBS)
                           :
     v.                    :
                           :            OPINION
JUANITA JACKSON, et al.,   :
                           :
            Defendants.    :
                           :
─────────────────────────────
```

APPEARANCES:

Lee S. Bender, Esq.
THE LAW FIRM OF JOSEPH CHAIKEN
1800 JFK Boulevard
14th Floor
Philadelphia, PA 19103
     Attorney for Plaintiffs Kevin and Jeneen McHugh

Mari I. Grimes, Esq.
MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN
200 Lake Drive East
Suite 300
Cherry Hill, NJ 08002
     Attorney for Defendant Juanita Jackson

Jay A. Gebauer, Esq.
POST & SCHELL, PC
Overlook Center
100 Overlook Drive
2nd Floor
Princeton, NJ 08540
     Attorney for Defendant Gambro Healthcare, Inc.

Giacomo Francesco Gattuso, Esq.
SWEENEY & SHEEHAN
216 Haddon Avenue, Suite 500
Westmont, NJ 08108
     Attorney for Defendant Philadelphia Insurance Company

**SIMANDLE,** District Judge:

This matter is before the Court on Defendant Gambro Healthcare, Inc.'s motion for summary judgment. [Docket Item 47.] Defendant seeks to exclude the testimony of Plaintiffs' two expert witnesses under Rule 702, without whom Plaintiffs cannot adduce sufficient evidence to proceed past summary judgment.

## I.  BACKGROUND

This case arises out of a motor vehicle accident that took place on July 6, 2005 in Cherry Hill, New Jersey.  According to the Complaint, Plaintiff Kevin McHugh was traveling southbound on the highway when Defendant Juanita Jackson, also driving southbound, "violently struck the rear of the plaintiff's vehicle[,] causing severe, permanent damages and injuries to the plaintiff."  (Compl. ¶9.)  The investigating police officer, Robert Schuenemann, found that the accident was a result of Ms. Jackson's inattention.  (Schuenemann Dep. 23:7-11, October 15, 2008.)  Just prior to this accident, Ms. Jackson had been receiving dialysis treatment at Defendant Gambro's Cherry Hill facility.  In addition to claiming that Ms. Jackson was negligent, Plaintiffs allege that Ms. Jackson was fatigued and hypotensive and therefore inattentive as a result of the dialysis treatment.  They further claim that Defendant Gambro breached the relevant standard of care by allowing Ms. Jackson to leave the

facility without fully assessing her vascular stability by taking a standing blood pressure measurement.[1]

Defendant now moves for summary judgment, contending that Plaintiffs' expert witnesses must be precluded from testifying and Plaintiffs therefore cannot establish the elements of negligence.[2]

Plaintiffs offer the testimony of Dr. Daisy Rodriguez and Cheryl Lachman R.N.  Dr. Rodriguez is a board certified doctor of internal medicine who received her medical degree from the University of Pennsylvania in 1987.  (Gebauer Cert. Ex-E ("Rodriguez CV").)  She is licensed as a physician in four

_____

[1] In a prior opinion on this matter, the Court rejected Defendant Gambro's motion to dismiss based on the late filing of an affidavit of merit, required under New Jersey law.  [Docket Item 42.]  The Court found that Gambro's failure to provide plaintiff with relevant discovery delayed preparation of the affidavit, making dismissal under N.J. Stat. Ann. 2A:53A-27 inappropriate.  [Id. at 12.]

[2] While Defendant did not submit a numbered statement of undisputed material facts in compliance with Local Rule 56.1(a), it did submit a statement of material facts without indicating whether the facts were undisputed or not.  The Court will exercise its discretion to permit the summary judgment motion without the appropriate statement because the factual issues are significantly circumscribed, and Plaintiffs do not appear to have been prejudiced by the omission.  See Shirden v. Cordero, 509 F. Supp. 2d 461, 463 n.1 (D.N.J. 2007).  Because Defendant does not object to the consideration of Plaintiffs' late-filed opposition, but merely argues that its own procedural errors should be overlooked because of it, the Court will consider Plaintiffs' opposition to the motion despite it having been filed late and without an explanation of its untimeliness.  The failure of both sides to conform to the simple requirements for summary judgment motion practice in this Court will not, however, be excused again in this case.

3

states.  (Id.)  Dr. Rodriguez's employment background involves
primary care, pain management, and injury rehabilitation.
(Rodriguez Dep. 7:1-16:24, June 10, 2009.)  Dr. Rodriguez is not
a nephrologist and does not diagnose or treat kidney failure.
(Id. at 23:16-24:22.)  She has not monitored dialysis treatment
since her medical residency in 1987, but she has on several
occasions managed post-dialysis complications.  (Id. at 25:15-21,
33:11-36:2.)

Dr. Rodriguez addresses the issue of what caused Ms.
Jackson's inattention leading to the accident.  Her opinion that
Ms. Jackson's inattention was the result of the dialysis
treatment is based on the following facts:  the fact that Ms.
Jackson had a history of delayed stabilization of her blood
pressure after dialysis in the weeks before and after the
accident;[3] the fact that, on the day of the accident, wide
fluctuations in Ms. Jackson's blood pressure were recorded during
treatment; the fact that Jenna McHugh, who was traveling behind
Plaintiff in another vehicle at the time of the accident and
walked to the scene, observed Ms. Jackson to be "out of sorts"
after the accident (J. McHugh Dep. 16:12-17, Oct. 2, 2008), and
went so far as to speculate that Ms. Jackson was intoxicated

---

[3]  Dr. Rodriguez identified six incidents of delayed blood
pressure stabilization from April 1, 2005 through July 8, 2005.
On July 8, two days after the accident, Ms. Jackson's blood
pressure did not stabilize until twenty-two minutes after
treatment.  (Gebauer Cert. Ex-F ("Rodriguez Report").)

4

(id.); and the fact that the responding police officer observed that Ms. Jackson appeared tired after the accident (Schuenemann Dep. 17:5-12, Oct. 15, 2008).  (Gebauer Cert. Ex-F ("Rodriguez Report").)

To these facts, Dr. Rodriguez added a number of expert opinions based on her own training and experience as well as three textbooks about the effects of dialysis treatment: that hypotension and fatigue are common consequences of dialysis; that in a person of Ms. Jackson's age and vascular status, mild shifts in blood pressure can cause significant fluctuations in mental status; that observations that a person is "out of sorts" or "extremely tired" are consistent with fatigue and hypotension; and that fatigue and hypotension can cause inattentiveness. (Id.)  Applying this expert knowledge to the facts in this case, Dr. Rodriguez concluded that Ms. Jackson was fatigued and hypotensive as a result of the dialysis and that this contributed to the accident.  (Id.)  Dr. Rodriguez did not opine as the general standard of post-dialysis care.[4]

---

[4]  When asked whether she had any opinion as to the general standard of care, as distinct from Gambro's internal policy, Dr. Rodriguez replied that she was prepared only to discuss Defendant's breach of its own policy, not whether Defendant's conduct fell below the standard of care.  (Rodriguez Dep. 38:10-39:18.)  She made clear that she did not know what the standard of care was for dialysis patients.  (Id.)  Whether Dr. Rodriguez will ultimately be permitted to testify about the breach of Defendant's own policy is doubtful, since the standard of care is not generally measured by provisions in internal guidelines but rather by the accepted medical practice of those who are

Defendant argues that Dr. Rodriguez is not qualified, that her method is not reliable, that there is not a valid connection between her testimony and the facts and issues in the case, and that her opinion constitutes a net opinion.  Defendant does not challenge Nurse Lachman's qualifications or testimony as to standard of care, but merely maintains that she does not address causation in her expert report.

Without admissible testimony on causation, Defendant argues, it is entitled to summary judgment.  The Court must determine whether Dr. Rodriguez's testimony as to causation is admissible, and if not, whether Nurse Lachman's testimony is sufficient for Plaintiffs to establish a prima facie case.

## III.  DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving

---

practicing in this medical specialty.  See generally Rosenberg by Rosenberg v. Cahill, 492 A.2d 371 (N.J. 1985).

party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" <u>Hunt v. Cromartie</u>, 526 U.S. 541, 552 (1999) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986)).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Liberty Lobby</u>, 477 U.S. at 250; <u>Brewer v. Quaker State Oil Refining Corp.</u>, 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted).  These findings, in turn, must be based upon a determination of whether contested evidence is admissible under the Federal Rules of Evidence, for only admissible evidence may be considered in determining whether a "genuine" dispute of material fact exists under Rules 56(c)(2) & 56(e)(2), Fed. R. Civ. P. (Dec. 1, 2009).

## B.  Admissibility of Expert Testimony Generally

The admissibility of expert testimony is governed by <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993) and Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

7

As the Supreme Court explained in Daubert, district court judges perform a "gatekeeping role," 509 U.S. at 596, by assessing whether expert testimony is both relevant and methodologically reliable in order to determine whether it is admissible under Rule 702.  Id. at 590-91.[5]

Under the law of this Circuit, Daubert and Rule 702 call upon the Court to examine the admissibility of expert testimony in light of three factors: the qualifications of the expert, the reliability of his or her methodology and the application of that methodology, and whether the testimony fits the matters at issue in the case.  In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741-43 (3d Cir. 1994); see Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000).  An expert's qualification to testify is based on whether the witness has the "specialized knowledge" referred to in the rule regarding the area of testimony.  Id.

---

[5]  State law regarding witness competency governs in a diversity action under Federal Rule of Evidence 601, but state law does not govern the admissibility of a competent witness' testimony.  To the extent that federal and state law are inconsistent on the procedural question of admissibility, federal law controls.  See Mathis v. Exxon Corp., 302 F.3d 448, 459 (5th Cir. 2002); Miville v. Abington Memorial Hosp., 377 F. Supp. 2d 488 (E.D. Pa. 2005).  Though acknowledging the applicability of Rule 702 and Daubert to Defendant's motion, both parties rely extensively upon New Jersey law as to the qualification of doctors to testify in malpractice actions.  To the extent that Defendants intended to challenge the competency of Plaintiff's witnesses or to make an argument about substantive malpractice proof requirements, they have not so argued in the present motion nor discussed the relevant rules.

Reliability refers to the rule's requirement that "the testimony is the product of reliable principles and methods," and is governed by the Supreme Court's decision in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).  Finally, there must be "a valid scientific connection" — a so-called "fit" — between the expert's testimony and the facts and issues in the case in order for the expert's testimony to be admissible. <u>Paoli</u>, 35 F.3d at 743.  The proponent of expert testimony must establish the admissibility of the expert's opinion by a preponderance of the evidence.  <u>Id.</u> at 744.

### C.  Qualifications of Dr. Rodriguez

Rule 702 requires the witness to have "specialized knowledge" regarding the area of testimony.  The Court of Appeals has explained that an expert's qualifications should be assessed "liberally," recognizing that "a broad range of knowledge, skills, and training qualify an expert as such."  <u>In re Paoli</u>, 35 F.3d at 741.

Defendant argues that because Dr. Rodriguez does not have recent training or experience in the specialization of nephrology or extensive experience with post-dialysis care, she is not qualified to render an opinion on the effects of dialysis on Ms. Jackson's blood pressure and fatigue level, or to analyze Ms.

Jackson's treatment records.[6]  Under the federal rules, "the fact that a doctor is not a specialist in a particular field goes not to the admissibility of the opinion but rather to the weight that the jury may wish to place upon it."  Cree v. Hatcher, 969 F.2d 34, 38 n.5 (3d Cir. 1992); Holbrook v. Lykes Bros. S.S. Co., Inc., 80 F.3d 777, 782 (3d Cir. 1996) (holding that an internist was sufficiently qualified to give expert testimony on his diagnosis of mesothelioma even though he was not pathologist, oncologist or expert in definitive cancer diagnosis).  See also In re Paoli, 35 F.3d at 741; Hammond v. International Harvester Co., 691 F.2d 646, 652-53 (3d Cir. 1982); Knight v. Otis Elevator Co., 596 F.2d 84, 87-88 (3d Cir. 1979).

Defendant does not cite or make any arguments regarding federal law on this point, relying exclusively on state law decisions.  The Court need not comment on the accuracy of Defendant's reading of these state cases.  The Court finds that to the extent that New Jersey state law on admissibility requires additional qualifications to those possessed by Dr. Rodriguez, such authority is inconsistent with the relevant federal rule that lack of specialization goes to weight and not admissibility.  Since federal procedural rules govern even in this diversity

---

[6]  Defendant also argues that Dr. Rodriguez is not qualified to testify as to the standard of care for dialysis practitioners. However, Dr. Rodriguez does not address the standard of care for dialysis practitioners, and she will not be permitted to so testify at trial.

action, inconsistent state procedural rules are irrelevant.[7]

Even without Dr. Rodriguez's admittedly limited experience with post-dialysis care, as a board certified and practicing internist who has also researched the literature regarding after-effects of dialysis, Dr. Rodriguez is qualified to discuss the physiological effects of dialysis treatment, to testify as to the effects of hypotension on attentiveness and decision-making, and to draw conclusions based on the Ms. Jackson's treatment records and third parties' observations of Ms. Jackson about whether Ms. Jackson was suffering from fatigue or hypotension as a result of dialysis at the time of the accident.  To the extent that her opinion should not be given as much weight as the opinion of a nephrologist on these matters, Defendant will be entitled to make that argument to a jury and offer competing testimony.

### D.  Dr. Rodriguez's Method and Application to These Facts

Daubert describes "the overarching subject" of the inquiry envisioned by Rule 702 as "the scientific validity and thus the evidentiary relevance and reliability of the principles that underlie a proposed submission."  Daubert, 509 U.S. at 594.  As to the level of scrutiny involved, the Third Circuit Court of

---

[7]  See supra note 6.  Again, while state law as to competency or the substantive requirements of a medical malpractice claim may be relevant to this action, these are not the arguments put forward by Defendant.

Appeals in <u>Paoli</u> said that:

> The grounds for the expert's opinion merely have to be good, they do not have to be perfect.  The judge might think that there are good grounds for an expert's conclusion even if the judge thinks that there are better grounds for some alternative conclusion, and even if the judge thinks that a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result.

<u>Id.</u> at 742, 744 (internal quotations and citations omitted).  In other words, the test "is not whether a particular . . . opinion has the best foundation or whether it is demonstrably correct.  Rather, the test is whether the particular opinion is based on valid reasoning and reliable methodology."  <u>Oddi v. Ford Motor Co.</u>, 234 F.3d 136, 145-46 (3d Cir. 2000) (internal citations omitted).

The issue of fact addressed by Dr. Rodriguez's testimony is the cause of Ms. Jackson's inattention leading to the accident.  Dr. Rodriguez relied on a partial medical history (Ms. Jackson's dialysis treatment records from April 2003 to July 2007), third parties' observations of Ms. Jackson immediately after the accident, her knowledge of the effects of dialysis, and the report of the treatment on the day of the accident, to retroactively diagnose Ms. Jackson's inattention on the day of the accident as having resulted from fatigue and hypertension caused by her dialysis treatment.

Dr. Rodriguez concluded that Ms. Jackson's "inattention was caused by hypotension that should have been picked up had the

policies of Gambro Dialysis Center been followed."  (Rodriguez
Dep. 78:24-79:5.)  The assessment of evidence to identify the
underlying cause of observed symptoms from among the possible
causes is called differential diagnosis.  The assessment made by
Dr. Rodriguez in this case is not a typical differential
diagnosis, because it attempts to explain an ephemeral past
condition (i.e. inattention) that is itself only known by
circumstantial evidence (i.e. the accident and observations of
witnesses).  Nevertheless, the Court finds that the guidance
provided in Paoli as to the reliability of such diagnosis
provides the relevant standard.  See generally In re Paoli, 35
F.3d 717.[8]

At issue in Paoli was expert medical testimony that
determined, on the basis of differential diagnosis, that the
plaintiffs' illnesses were caused by exposure to certain
chemicals.  Id.  The defendants contended that the doctors'
methodology was unreliable.  Id. at 746.  Paoli found that most
of the Daubert factors "are of only limited help" in assessing
whether a particular differential diagnosis is reliable, and

---

[8]  Defendant reiterates the arguments it made with regard to
reliability in its discussion of fit.  This confusion is
understandable, because the potential problem with the
reliability of a differential diagnosis is that it involves a
diagnosis based on insufficient facts to rule out alternative
explanations, a problem similar to the one described as a problem
of "fit" is other contexts.  Because Paoli analyzes the types of
problems Defendant alleges as problems of reliability, the Court
will consider those arguments as going to reliability.

13

relied heavily on "the existence of standards controlling the technique's operation," to decide whether the differential diagnosis in that case was reliable.  Id. at 758.

The court identified several standard diagnostic techniques involved in differential diagnosis:  a physical examination of the patient, a review of medical records, taking a medical history and conducting of laboratory tests.  Id.  However, the court found that "[A] doctor does not always have to employ all of these techniques in order for the doctor's differential diagnosis to be reliable. . . . [S]ometimes differential diagnosis can be reliable with less than full information."  Id. at 759.  Not only can differential diagnosis be made with less than full information, it is also not necessary that all of the data point to the same conclusion.  Id. at 766.  Instead, the question is whether the core function of the differential diagnosis has been fulfilled in each case.  The Paoli court found that "all of the experts agree that at the core of differential diagnosis is a requirement that experts at least consider alternative causes," and that "performance of standard diagnostic techniques provides prima facie evidence that a doctor has considered such causes and has attempted to test his or her initial hypothesis as to cause."  Id. at 759.

Recognizing that the circumstances of differential diagnosis vary case-by-case, the Court of Appeals crafted a flexible test

14

for assessing differential diagnosis.  The Court held that expert

testimony based on differential diagnosis should be excluded if:

> [The doctor] engaged in very few standard diagnostic
> techniques by which doctors normally rule out alternative
> causes and the doctor offered no good explanation as to
> why his or her conclusion remained reliable, or the
> defendants pointed to some likely cause of the
> plaintiff's illness other than the defendants' actions
> and [the doctor] offered no reasonable explanation as to
> why he or she still believed that the defendants' actions
> were a substantial factor in bringing about that illness.

Id. at 760.  Adapting this test to the facts here, the question

would be whether Dr. Rodriguez performed or had access to the

results of standard diagnostic techniques to connect Ms.

Jackson's inattention to her dialysis treatment.  If she only

performed or had access to very few such tests, the question

would be whether she can provide a good explanation as to why her

conclusion remained reliable.[9]  Because Defendant identifies the

accident itself as an alternate explanation for Ms. Jackson's

---

[9]  The court in <u>Paoli</u> did offer two examples of when
alternative need not be examined.  <u>Paoli</u>, 35 F.3d at 760 n.30.
The first example was of a patient with x-rays showing a
fractured arm who tells the doctor that he hurt the arm in a
biking accident.  <u>Id.</u>  The court noted that the doctor could
reliably conclude that the patient had a fractured arm caused by
a biking accident without further attempts to rule out other
causes.  <u>Id.</u>  The second example involves a patient exposed to an
illness-causing chemical.  <u>Id.</u>  Even though the patient was also
exposed to other substances that could cause the illness, the
doctor might reliably conclude that the exposure to the chemical
caused it if there is sufficient information about probabilities.
<u>Id.</u>  To the extent that Dr. Rodriguez's diagnosis falls into one
of these categories, she has not yet described her method in
enough detail to determine that this is the case.

symptoms, which certainly is plausible, Dr. Rodriguez also needs to offer a reasonable explanation as to why she still believes that the defendants' actions caused the inattention.[10]

In the present case, Dr. Rodriguez undoubtedly engaged in or had access to the results of very few of the standard diagnostic techniques by which doctors rule out alternative explanations. Dr. Rodriguez was asked to determine the cause of Ms. Jackson's inattention on the day of the accident.  Dr. Rodriguez had no contemporaneous examination to refer to, or the results of any diagnostics directed at determining whether Ms. Jackson suffered from hypotension or fatigue on the day and at the time in question.  Indeed, other than the sitting blood pressure measurement made at the end of Ms. Jackson's treatment, there was no direct medical evidence available.

Instead, as noted above, Dr. Rodriguez reviewed Ms. Jackson's medical history and treatment records, and relied on third party descriptions of Ms. Jackson's demeanor after the accident.  This evidence is far less substantial than the

_____

[10]   In some ways, the <u>Paoli</u> test for assessing a differential diagnosis merely shifts the <u>Daubert</u> inquiry one step further down the logical line.  Instead of asking whether Dr. Rodriguez's method is reasonable and reliable, the Court asks whether Dr. Rodriguez can offer a reasonable explanation for why her method remained reliable despite its shortcomings.  But the <u>Paoli</u> test does focus the Court's attention on specific aspects of Dr. Rodriguez's explanation of her method.  Specifically, the Court will examine whether she can specify how she was able to adequately rule out alternative causes despite the lack of traditional diagnostic tests.

evidence ordinarily relied on in making a medical diagnosis.  The
Court will not, therefore, grant to Dr. Rodriguez the presumption
that she ruled out alternative explanations.  The burden is on
Plaintiffs as the parties seeking admissibility of this expert
testimony, and ultimately Dr. Rodriguez, to explain how it is she
was able to reliably conclude that hypotension and fatigue caused
Ms. Jackson's inattention and subsequent observed disorientation.
Dr. Rodriguez must provide a good explanation as to why her
conclusion remained reliable even though it was made without the
techniques normally used to make such a diagnosis.

     Such an explanation has not yet been provided to the Court.
Dr. Rodriguez's report does not discuss alternative explanations
for Ms. Jackson's inattention, or her observed symptoms after the
accident.  In addition to not addressing the other possible
causes of inattention, or alternate explanations for Ms.
Jackson's post-accident behavior, Dr. Rodriguez also does not
explain in the report why she disregarded Ms. Jackson's testimony
that she felt fine on the day of the accident.  This fact,
standing on its own, is not determinative.  Indeed, Dr. Rodriguez
eventually explained in her deposition that she discounted Ms.
Jackson's subjective assessment of her state because, in her
medical judgment, someone suffering from the side effects of
dialysis is not able to accurately assess those deficiencies at
the time they are occurring.  (Rodriguez Dep. 115:9-116:23.)  An

17

expert is certainly permitted to come to a conclusion that is not supported by all of the data.  Paoli, 35 F.3d at 766.  However, given the paucity of available evidence here, and the fact that Ms. Jackson's subjective assessment is consistent with the alternative Dr. Rodriguez's differential diagnosis is supposed to be ruling out (that Ms. Jackson's inattention was unrelated to her dialysis treatment, that Ms. Jackson's inattention was merely ordinary distraction, or her subsequent symptoms were a result of the accident itself), Dr. Rodriguez must more adequately explain why her diagnosis was reliable despite Ms. Jackson's contrary subjective assessment of herself.

Whether Dr. Rodriguez can provide a "good explanation as to why . . . her conclusion remained reliable" and defend her method as required by Paoli is a question of fact.  The Court cannot rely on the deficiencies of the expert report to exclude her testimony, especially when Defendants have not established the relevant grounds in deposition.[11]  In Padillas v. Stork-Gamco,

---

[11]  Defendant identifies the accident itself — a 30 mile per hour collision in which air bags deployed — as an alternative explanation for the symptoms Dr. Rodriguez identified as symptoms of hypotension and fatigue.  At her deposition, Dr. Rodriguez was asked to respond to Officer Schuenemann's testimony that his observations about Ms. Jackson were consistent with someone who had just been in the type of collision that occurred.  (Rodriguez Dep. 73:5-77:3.)  Dr. Rodriguez responded that the Officer is a layperson; he is qualified to identify disorientation, but not to identify its cause.  However, Dr. Rodriguez was not asked directly why she disregarded the collision as a possible cause of the symptoms.  Perhaps Dr. Rodriguez has a good reason for believing that the trauma of the accident did not cause the

Inc., 186 F.3d 412 (3d Cir. 1999), the district court excluded plaintiff's expert testimony based on the expert's report without holding a hearing. 186 F.3d at 416-18. The Court of Appeals concluded that the district court abused its discretion when it excluded the expert's opinion without holding a hearing. Id. at 418. The Court explained: "The district court's analysis of the Lambert Report does not establish that Lambert may not have good grounds for his opinions, but rather, that they are insufficiently explained and the reasons and foundations for them inadequately and perhaps confusingly explicated." Id. In such circumstances, where a ruling on admissibility turns on factual questions, even where the party seeking to introduce the expert has not requested a hearing, a hearing is required. Id. at 417-18.[12]

---

observed symptoms. The Court simply does not know either way. Since Defendant has not yet provided Dr. Rodriguez an opportunity to explain why Defendant's theory does not undermine her conclusions, there is not yet a basis for excluding her testimony. See Paoli, 35 F.3d at 765 (noting that defendants failure to ask the right questions about why doctor excluded alternative explanation meant the basis for exclusion had not been established.)

[12]   In Oddi v. Ford Motor Co., 234 F.3d 136, 156 (3d Cir. 2000), the Third Circuit further explained that the holding in Padillas turned on the absence of evidence - a conclusory report (from which the district court could not deduce a methodology) and a scant record (whereas in Oddi a hearing was not required because the record, including two depositions of the excluded expert, was sufficient to make a reliability determination). Oddi, 234 F.3d at 153-55. To the extent that the record is fuller in this case and Plaintiffs have had greater opportunities to make the necessary explanations, Oddi potentially provides the

In summary, Dr. Rodriguez relied on a sparse record to
attempt a diagnosis of Ms. Jackson's inattention at the time of
the accident.  Because her attempt to make the diagnosis,
requiring her to distinguish the explanation she endorses from
other possible explanations, relied on few of the standard
diagnostic techniques, it is necessary that she explain to the
Court why she believed the diagnosis was still reliable.  She has
not done so in her report, but this is not a sufficient basis
upon which to exclude her testimony.  She may have good reasons
for rejecting the collision as the cause of Ms. Jackson's
demeanor post-accident.  The Court must conduct a _Daubert_ hearing
in order to make a determination as to Dr. Rodriguez's ability to
explain why her conclusion remains reliable despite the lack of
formal diagnostic techniques.

**E.  Net Opinion**

Defendant contends that because Dr. Rodriguez based her
opinion on the testimony of other witnesses as to Ms. Jackson's
condition, she offers only a "bare conclusion" that constitutes a
net opinion.  Defendant's argument is without merit.  Dr.
Rodriguez relied on a number of other sources of information,

---

grounds for making a ruling without a hearing.  However, the
Court will err on the side of caution in deciding whether to
dismiss an expert's testimony and provide Dr. Rodriguez an
opportunity to make the required explanations.

including medical texts and Ms. Jackson's medical records indicating problems with vascular stability.  Such an opinion is not a net opinion.  <u>See</u> <u>Nguyen v. Tama</u>, 688 A.2d 1103, 1107 (N.J. Super. Ct. App. Div. 1997).  Indeed, even if Dr. Rodriguez had based her opinion exclusively on the testimony of other witnesses, this would not necessarily render her testimony a net opinion, because she would be adding to that data her own medical expertise to render an opinion.[13]

### F.  Nurse Lachman's Testimony

Defendant argues for the exclusion of Nurse Lachman's testimony because she did not address causation.  Even if it were true that Nurse Lachman did not address causation, a witness need not address every aspect of a party's case in order to be helpful to a trier of fact.  Since Nurse Lachman does address the general

---

[13] Defendant argues along similar lines that Dr. Rodriguez must not be permitted to testify because her opinion is based, in part, on lay witnesses' descriptions.  But Defendant never explains why this should be so.  Arguments about the facts upon which an expert witness relies in forming her opinion generally fall under Rule 703 of the Federal Rules of Evidence.  Defendant makes no argument that a doctor may not rely on lay witnesses' general observations of a patient's symptoms under Rule 703. Indeed, it is not uncommon for a physician to elicit and rely upon the lay observations of a patient's relative or friends concerning the patient's symptoms and demeanor in considering a diagnosis.  The Court finds no reason to reject Dr. Rodriguez's testimony merely because she relied on the observations of lay observers as to matters within the lay observer's competency and personal knowledge (i.e. that someone seems tired or out of sorts).

standard of care, her testimony would still be relevant and admissible.  Nevertheless, the Court will also determine whether Nurse Lachman addresses causation because, if so, it may be that Defendant's motion would be denied regardless of whether Dr. Rodriguez's testimony is admissible.

Defendant argues that without proof that Ms. Jackson was actually suffering from the after-effects of dialysis at the time of the accident, causation cannot be proven.  Like Dr. Rodriguez's testimony, Nurse Lachman's testimony must be considered in light of the testimony of Officer Schuenemann.  He testified that the accident was caused by inattention, and that this inattention may have been a result of Ms. Jackson's fatigue. (Schuenemann Dep. 16:22-18:10, 23:7-11, 28:5-21, 32:8-17).  For the purposes of this motion, the Court must view the evidence in the light most favorable to Plaintiffs, and so the Court must assume that the accident was caused by inattention and that Ms. Jackson was fatigued.  The relevant issue of causation addressed by Nurse Lachman is what caused Ms. Jackson's inattention and fatigue (and the relationship between the two).

Questions of causation are often mixed questions of law and fact.  There is the factual question of causation, which is whether some event would have happened but for the occurrence of some prior event.  And there is also the legal question of causation, whether the connection between the two events is

legally sufficient.[14]  In this motion, Defendant alleges that
Nurse Lachman does not address factual causation, in other words,
that there is nothing in her testimony from which a reasonable
fact-finder could conclude that Ms. Jackson's inattention would
not have occurred but for the dialysis treatment.

Nurse Lachman testified that, to a "reasonable degree of
nursing probability," the kind of dialysis treatment Ms. Jackson
received on the day of the accident "increased Ms. Jackson's
chance of blood pressure instability, dizziness, and fatigue."
(Gebauer Cert., Ex-I ("Lachman Report"), at 4.)  She further
testified that the standard of care dictates that a medical
provider check a patient's standing blood pressure before
releasing the patient.  Failure to do so places a patient at risk
for injuries resulting from the possible side effects of
dialysis.  (Id.)  Therefore, the question with regard to Nurse
Lachman's testimony is whether a causal link between Ms.
Jackson's dialysis treatment and her inattention and fatigue can
be shown by demonstrating that the dialysis increased Ms.
Jackson's chances of suffering from those conditions, even if
other causes cannot be definitely ruled out.

Because inattention is such a general condition, and one

---

[14]  To complicate matters, because this is a medical
malpractice claim, the opinions from which conclusions about
causation are made must also be made with the requisite degree of
medical certainty.

that often occurs without any particular cause other than
ordinary distraction, whether a reasonable fact-finder could
conclude that the dialysis treatment was the cause of Ms.
Jackson's inattention depends in large part on the degree of the
increase in risk Nurse Lachman described.  If the dialysis
treatment Ms. Jackson received on the day of the accident is very
likely to have caused various side effects leading to
inattention, then this abstract statement of fact in combination
with the fact that the condition actually occurred would be
enough evidence upon which a fact-finder could determine
causation.  If, on the other hand, the increased risk of certain
conditions was relatively small, the fact that the condition
actually occurred would not be sufficient evidence to determine
that the dialysis caused it.[15]  Nurse Lachman's testimony will
also be made stronger or weaker depending on the extent to which
Dr. Rodriguez will be permitted to testify that the third
parties' observations of Ms. Jackson after the accident indicate

---

[15]  It is important to distinguish the nature of Nurse
Lachman's testimony from that of Dr. Rodriguez.  Nurse Lachman
testified about the background statistical relationship between
this kind of dialysis care Ms. Jackson received and various side
effects.  Dr. Rodriguez testified that based on her expert
opinion, what actually happened in this case is that Ms.
Jackson's inattention was caused by hypotension.  Either form of
testimony can, under the right circumstances, be sufficient and
reliable proof of causation.  In this case, the question as to
Dr. Rodriguez's testimony is reliability, and the question as to
Nurse Lachman's testimony is sufficiency - an intuitive result
since the certainty of a conclusion often trades off with the
reliability of that conclusion.

that she was suffering from the side effects of dialysis that Nurse Lachman indicates Ms. Jackson was placed at increase risk of suffering from as a result of Defendant's breach.

It is impossible to assess at this stage whether Nurse Lachman's testimony would be sufficient for a fact-finder to find causation, in part because the Court has not yet determined what parts of Dr. Rodriguez's testimony will be admitted, and in part because Nurse Lachman never discusses the degree of the increase she speaks about.  Whether Nurse Lachman's testimony is sufficient turns on what other information the jury has been given by Dr. Rodriguez, and the degree of increase to which she is able to testify.  Therefore, the Court will reserve decision until the conclusion of the pretrial hearing with regard to Dr. Rodriguez's testimony to determine whether Plaintiffs have met the burden of adducing evidence from which a fact-finder could find causation.

## IV.  CONCLUSION

Dr. Rodriguez will be given an opportunity at the pretrial hearing to explain how she was able to come to her conclusion on causation, including how and why she disregarded alternative explanations.  If she cannot offer the explanations required by Paoli to the satisfaction of the Court, her testimony must be excluded.  After that determination has been made, the Court will

25

consider whether Plaintiff has adduced sufficient evidence from

which a fact-finder could determine that Defendant caused

Plaintiffs' injuries.  The Court will convene a <u>Daubert</u> hearing

as soon as practicable.  The accompanying Order shall be entered.


**March 2, 2010**                              **s/ Jerome B. Simandle**
Date                                  JEROME B. SIMANDLE
                                      United States District Judge


24